IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA 2010 MAR 24 P 2: 54

AUGUSTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR 109-127 |
| | ) | |
| MORGAN CHASE WOODS | ) | |

---

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

---

In the above-captioned criminal case, the government has charged Defendant Morgan

Chase Woods ("Woods") with one count of Receipt of Child Pornography, in violation of

18 U.S.C. § 2252A(a)(2), and two counts of Possession of Child Pornography, in violation

of 18 U.S.C. § 2252A(a)(5)(B). The matter is now before the Court because Woods filed a

motion to suppress evidence, arguing that (1) he did not receive a proper advisement of his

constitutional rights prior to speaking with law enforcement agents and that (2) his consent

to search and statements to agents were not freely and voluntarily made or given. (Doc. nos.

45, 66).[1] The Court held an evidentiary hearing on the matter, at which time the Court heard

testimony from Special Agent Marybeth Eversman with the Naval Criminal Investigative

Service ("SA Eversman"), Special Agent Brian Ozden with the Federal Bureau of

---

[1] When Woods filed his original motion to suppress, he requested permission to file his supporting affidavit and other documentation under seal. (See doc. nos. 45, 47). That request was denied, and Woods was instructed to file the necessary documentation to bring the motion into compliance with the Local Rules. (Doc. no. 64, p. 2). The supplemental motion to suppress did not provide any additional argument or briefing but simply provided an affidavit and four exhibits. (Doc. no. 66). For ease of reference, the Court will refer to the two motions simply as one motion to suppress.

Investigation ("SA Ozden"), and Woods. Now, for the reasons developed more fully herein, the Court **REPORTS** and **RECOMMENDS** that the motion to suppress be **DENIED**.

## I.     FACTS

### A.     SA Eversman

SA Eversman is currently stationed in Naples, Italy, but at the time of the events in question, she was the case agent for the above-captioned case. Although she has been a Special Agent with the Naval Criminal Investigative Service ("NCIS") since September of 1987, she is a civilian, and most recently before her posting to Naples, she was stationed at the Naval Submarine Base at Kings Bay, Georgia. After several other agents had been involved with this case, SA Eversman became the case agent in March of 2009, and she remained as the case agent until she left for Naples in August of 2009.

SA Eversman testified that the investigation in this case began when Woods's ex-wife, Autumn Woods ("Ms. Woods"), contacted the Air Force Office of Special Investigation to advise them that she believed Woods had accessed and downloaded child pornography on a computer in her possession. Because Woods was an active duty member of the Navy, the Air Force contacted NCIS in Arizona. An NCIS agent interviewed Ms. Woods and obtained her statement about the child pornography on the computer in her possession; Ms. Woods also consented to have her computer seized and analyzed by a computer forensic lab. Known child pornography images were discovered on that computer, and at that point, SA Eversman became involved in the investigation.

SA Eversman then set out to determine if Woods had a computer that he was currently using and whether there was any child pornography on it. To accomplish this, SA

2

Eversman made plans to interview Woods with SA Ozden. Although SA Eversman had discussed an investigation plan with others, and although the United States Attorney's Office had been briefed sometime in December 2008 or January 2009 concerning this case, at this point in the Spring of 2009, no formal charges had been brought against Woods; indeed, SA Eversman had not yet even determined if Woods had a computer that he was currently using. In discussing the case with SA Ozden, SA Eversman told him that she was obligated to advise Woods of his rights with the military advice of rights form because Woods was an active member of the Navy and was suspected of committing a crime. SA Eversman testified that this obligation to advise Woods of his rights through the use of the military form was entirely a consequence of Woods's status in the military, regardless of whether Woods might eventually face military or civilian charges. In any event, at this point, no charges had been filed against Woods.

An interview was arranged through Woods's command and Special Agent Steve Cutcliff ("SA Cutcliff") of the National Security Agency. Woods was working the midnight shift at Fort Gordon, and the agents determined that it would be most feasible to interview him during his work hours. The interview was set up to be conducted in office space near Woods's work area, but Woods was not made aware ahead of time that the interview was going to occur. Woods's chief escorted him to the interview, which began at approximately 5:30 a.m. on May 12, 2009.

### 1.    May 12, 2009 Interview

Woods's chief left once he brought Woods to the interview, leaving SA Eversman, SA Ozden, and SA Cutcliff with Woods in the office space where the interview occurred;

3

none of the agents were armed because weapons are prohibited in that area of Fort Gordon. The agents identified themselves by displaying their credentials and told Woods that they wanted to speak with him because a child pornography web site had been taken down, and the agents were interviewing persons whose email addresses had been identified with the web site. This story was not true but had been devised as a cover to explain why the agents were speaking with Woods without revealing that his ex-wife had been in contact with law enforcement; Ms. Woods had expressed fear of Woods and did not want to be identified as the person who had provided information to law enforcement agents. SA Eversman testified that she did not recall Woods making any particular admission or denial concerning the stated reason for the agents' presence.

SA Eversman collected basic biographical information for an interview log and then advised Woods that because he was a member of the military and suspected of a crime, she was obligated to advise him of his rights. She then presented him with a Military Suspect's Acknowledgment and Waiver of Rights Form ("the Form"), which she had filled out prior to Woods's entrance to the room. Gov't Ex. 1. The Form stated that Woods was "suspected of receipt and/or transfer of child pornography" and advised him:

    (1)    I have the right to remain silent and make no statement at all;

    (2)    Any statement I do make can be used against me in a trial by court-martial or other judicial or administrative proceeding;

    (3)    I have the right to consult with a lawyer prior to any questioning. This lawyer may be a civilian lawyer retained by me at no cost to the United States, a military lawyer appointed to act as my counsel at no cost to me, or both;

    (4)    I have the right to have my retained civilian lawyer and/or appointed military lawyer present during this interview; and

    (5)    I may terminate this interview at any time, for any reason.

Id. The Form concludes with the following paragraph:

> I understand my rights as related to me and as set forth above. With that understanding, I have decided that I do not desire to remain silent, consult with a retained or appointed lawyer, or have a lawyer present at this time. I make this decision freely and voluntarily. No threats or promises have been made to me.

Id.

SA Eversman testified that although the Form may have changed over the years since she became a Special Agent with NCIS, primarily with respect to agency names, the advice of rights has basically remained the same. SA Eversman also testified that although Woods was not in custody and had not been brought to the meeting in handcuffs, military protocol, as noted above, requires that whenever a member of the military is suspected of a crime, the Form advising the member of his rights must be provided. SA Eversman reviewed the Form with Woods by reading it aloud to him and asking if he had any questions. Woods and SA Eversman both signed the form, with Woods also initialing next to each paragraph to indicate that he understood his rights as presented to him. Having reviewed each part of the Form verbatim with Woods, SA Eversman asked Woods if he had any questions. Woods had none.

Woods had been in the room approximately ten minutes - long enough for the biographical information to be collected - before the Form was presented to him. Upon completion of review of the Form, SA Eversman asked Woods if he would be willing to talk to the agents, and he agreed to do so. Woods never asked for any attorney, and no promises were made to Woods to get him to sign the Form or speak with the agents.

At this point, SA Ozden took the lead in the interview. He asked how many computers Woods had used in his life, where were they located, had he ever accessed any child pornography sites, what sort of internet connections did he have, and what were his email accounts. The tone of the interview was professional, casual, and non-accusatory. Woods identified three computers that he had used: one that he had used at his mother's house when he was younger, one in the possession of his ex-wife, and one at his residence. He also identified internet connections through two separate roommates and reported viewing child pornography as part of pop-up ads or in files that had inadvertently been in peer-to-peer file sharing. Woods also provided a current and former email address. As to a government computer that Woods had used at Fort Gordon, SA Eversman had received email and unclassified accounts of Woods on a CD from the information technology personnel at the Navy command. This CD contained information about internet web site history and emails, but SA Eversman testified that she did not find any data on that CD that was pertinent to her child pornography investigation of Woods.[2]

Woods was then asked for permission to let SA Ozden "preview" Woods's computer at his residence to see if there was any child pornography on it. Woods agreed to a search of his residence, and Woods's consent was documented on a Permissive Authorization For Search and Seizure form. Gov't Ex. 2. Upon reading the Permissive Authorization, Woods restricted the scope of his consent to only allow a search of his computer, a limitation which

---

[2]It came to light at the hearing that this CD had never been provided to the government attorney or Woods. Although SA Eversman testified that there was no information "of evidentiary value" on the CD, the Court directed that this CD be provided to both the government attorney and to the defense.

was honored. SA Eversman testified that no threats or promises were made to obtain this consent. This initial interview lasted approximately 30 minutes.

At this point, the end of Woods's work shift was approaching, so it was decided that since Woods was going home anyway, he would drive himself to his residence, with the agents following in a separate car.[3] Woods had to go back to his work space before leaving, so the agents made arrangements to meet Woods at a gas station on Fort Gordon. Although a member of Woods's command may have escorted Woods back to his work station, the interviewing agents did not direct any such escort, and they left separately to meet Woods at the gas station. Woods arrived at the gas station alone, and he drove, unaccompanied, to his residence.

At the residence, Woods stated that his roommates were present, and he asked to have an opportunity to get his room in order before the agents entered. Woods was allowed to enter his room unaccompanied, and after a period of time, came out and then allowed SA Ozden into his room. SA Eversman and SA Cutcliff stayed outside of the room where SA Ozden was conducting the computer "preview." While waiting for SA Ozden to finish, the two agents and Woods did not discuss child pornography but rather engaged in casual conversation about things like Woods's work. During this time, Woods seemed to be aware of his surroundings and did not seem to be under the influence of drugs or alcohol. The tone of the conversation was professional, respectful, and non-accusatory.

---

[3] SA Eversman was aware that Woods's shift for work ran from approximately 11:00 p.m. to 7:00 a.m.

When SA Ozden exited the room, he asked Woods what he thought may have been found on the computer. Woods said that child pornography had probably been discovered because he had been involved in peer-to-peer file sharing and had not had time to sort through everything that he had received. Woods was then asked if he would allow the computer to be sent out for further forensic examination to determine if there was child pornography on it, and if there was, the extent of it. Woods agreed, and SA Eversman took custody of the computer; she then entered the computer into evidence at the Naval Air Station in Jacksonville, Florida so that it could be forensically examined for child pornography. SA Eversman also filled out an examination request for the Defense Computer Forensic Lab ("DCFL") so that the computer could be mailed out to the DCFL for examination.

Based on the information that SA Eversman received back from DCFL, she decided to interview Woods again. This second interview occurred on July 16, 2009, and was conducted with Special Agent Noah Williams ("SA Williams"), the agent with NCIS who had been designated as the new case agent once SA Eversman left for her posting to Naples.

### 2. July 16, 2009 Interview

This second interview occurred at the Army Criminal Investigation Demand ("CID") office at Fort Gordon at approximately 9:30 a.m., and SA Eversman coordinated with the special agent in charge at Army CID and Woods's command to set up the interview.[4] Woods's command brought him to the interview, and upon his entering the room, SA Eversman and SA Williams identified themselves by presenting their credentials. Woods

---

[4]At that time, Woods had moved from the night shift to the day shift.

did not appear impared and was aware of his surroundings. SA Eversman had no intent to arrest him that day at the end of the interview.

Woods was again presented with the Form, which had been filled out prior to Woods's arrival. This time, however, the top of the Form stated that Woods was "suspected of receipt and/or transfer of child pornography; child sexual abuse." Gov't Ex. 5. SA Eversman reviewed the advice of rights with Woods and both signed the Form; Woods also initialed next to each right, indicating that he understood each right. Woods had no questions about his right to counsel or about the Form. Woods never asked for any attorney, and no promises were made to Woods to get him to sign the Form or speak with the agents.

SA Eversman then proceeded to interview Woods for approximately two hours. At the conclusion of the interview, she asked Woods if he wanted to make a written statement. SA Eversman explained that she needed to document the interview, and the preferred method was to obtain a written statement from him so that there would be no misunderstanding as to what was communicated during the interview. Woods was offered the opportunity to type the statement himself or to have SA Eversman type the statement while Woods observed and provided input; Woods chose to observe and contribute while SA Eversman typed. When SA Eversman finished typing the statement that had been prepared with Woods's assistance, Woods reviewed it, made any changes that he wanted, and initialed at the beginning and end of each paragraph to indicate that he read each paragraph and the information therein was correct. Gov't Ex. 6. During the process of drafting the statement, SA Eversman found Woods to be articulate and forthcoming with suggestions, as evidence by the mark-outs and the use of Woods's words entirely for the last paragraph of the statement. Id. at 3-4. Woods

then swore to the truth of the entirety of the statement.[5] Id. at 4. The process of preparing the written statement took approximately two and one half hours.

Once the statement was finalized, per military protocol, SA Eversman obtained Woods's fingerprints and took his photograph. Woods was also then asked about an external hard drive that may have been taken by his ex-wife or may have been at his residence, packed in boxes that his ex-wife had not removed when she left. Woods consented to let the agents search at his residence for the external drive. As Woods was approaching the end of his shift and did not have a vehicle of his own to drive, he was expecting a roommate to pick him up and take him back to his residence. Therefore, Woods rode with SA Eversman and SA Williams to the pick up point, and Woods sent his ride away. Woods and both agents then returned to the residence and together searched through boxes in the garage for the external hard drive, but the drive could not be found. SA Eversman testified that the tone of the July 16 encounter was professional and respectful, despite the accusations that were raised based on the results of the forensic examination of Woods's computer, with no raised voices used by anyone and no threats being made.

At the conclusion of the unsuccessful search for the external hard drive, SA Eversman then checked with Woods's command and was asked by command to tell Woods to pack for staying at the barracks for a couple of days. Woods packed up some items and the agents took him back to the barracks at Fort Gordon, where he stayed until his arrest on

_____

[5]Although neither the May 12 or July 16 interviews were recorded, SA Eversman testified that she considered the method used to obtain the statement to be reliable, and there is absolutely nothing in the record to suggest that the statement is inaccurate. Indeed, as noted above, Woods himself swore to its accuracy.

August 11, 2009. Command wanted Woods to stay in the barracks for his safety and welfare based on the nature of the allegations against him, but he was not "confined" to the barracks; as far as SA Eversman knew, Woods returned to his regular work schedule the next day. In any event, Woods was taken back to the barracks per military protocol because his command had directed him to return, not because he was under arrest or otherwise restricted in his movement by the agents interviewing him.

### B. SA Ozden

SA Ozden is part of the Project Safe Childhood Initiative run by the Department of Justice, and as part of this program, he came to assist SA Eversman with the May 12, 2009 interview of Woods. SA Ozden testified that as an agent with the Federal Bureau of Investigation ("FBI"), he follows the FBI policy on giving <u>Miranda</u> rights. In his opinion, the May 12 interview of Woods was non-custodial and did not qualify under the FBI policy as requiring that <u>Miranda</u> warnings be given. However, when SA Eversman explained to him that she was required to advise Woods of his rights by virtue of his status as an active duty member of the military suspected of a crime, SA Ozden told her to use whatever forms NCIS required because he was only there to assist.

SA Ozden further testified that he has been an FBI agent since 2003, and during his years of experience in working on child pornography cases, the majority of the time he seeks consent to search rather than applying for a search warrant, not only because such allegations are common but also because the cases can take an extended period of time to develop. In keeping with this practice, in this case agents sought and obtained consent from Woods to search rather than obtaining a search warrant. Gov't Exs. 2, 3.

When Woods and the agents arrived at his residence on May 12, Woods was allowed to go into his room by himself to collect up materials prior to SA Ozden "previewing" the computer located in Woods's room. During this "previewing," SA Ozden used a specialized type of software to look for suspected images of child pornography, and Woods knew that SA Ozden was looking for this type of material. SA Ozden made no promises to Woods that if child pornography was found, Woods would not be charged.

Although SA Ozden did not specifically remember exactly what he may have said to Woods, SA Ozden stated that it is his policy to tell suspects that he will let the United States Attorney's Office know of any cooperation, but he also tells suspects that he has no authority over decisions about prosecution. When SA Ozden was asked at the hearing whether Woods had been promised that he would not be prosecuted, SA Ozden stated, "Absolutely not." Thus, on May 12, Woods gave his consent to search knowing that he was a suspect in a child pornography investigation and that law enforcement agents were seeking his cooperation in that investigation, but he had not been promised anything in return for that cooperation. Rather, he had been told that those who did have prosecutorial decision-making authority - not the agents present with him - would be informed of any cooperation that was provided.

### C.     Woods

Woods testified that he had been married to Autumn Marie Woods, the woman from whom the information used to start this investigation was obtained, from age 18 until age 23. Approximately two years ago, Woods gave a computer to Ms. Woods that the two had previously shared; the computer became "hers" when Woods bought his own computer with an enlistment bonus. Woods gave the previously-shared computer to Ms. Woods prior to

their separation in December of 2008, and he kept the computer bought with the enlistment bonus for his own use.[6] As noted above, SA Eversman and SA Ozden initiated the May 12, 2009 interview with Woods at Fort Gordon based on the information originally obtained from Ms. Woods and from the computer in her possession.

## 1. May 12, 2009 Interview

As Woods approached the end of his shift on May 12, his supervisor took him to meet with SA Eversman, SA Ozden, and SA Cutcliff[7]; Woods did not know who he was going to meet when his supervisor came to get him. Woods met with the agents in a room on the first floor of the Gordon Center for Language that was used for security screenings.[8] The agents told Woods that they wanted to ask him some questions because his IP address had been found on a particular web site. Also, SA Ozden introduced himself as part of a task force that was interested in controlling, confiscating, and removing contraband from circulation.

SA Eversman collected some initial biographical information and then asked Woods if he might have any material related to child pornography. Woods acknowledged at the

---

[6]The computer that Woods kept for his own use was the machine that SA Ozden "previewed" on May 12 at Woods's residence.

[7]Woods testified that he had been working 7 to 7.5 hours when his supervisor took him to this meeting.

[8]Although this was a secure area, Woods also worked on a daily basis in a secure area. Thus, he was actually moving from one secure area to another for the interview. Woods also testified that although he saw a holster on one of the agents, he did not recall actually seeing a weapon on an agent during either the May 12 or July 16 interview. As recounted, *supra*, the agents were not armed because weapons were not permitted in the area where the interview took place.

hearing that SA Eversman had advised him of his rights within several minutes of his arrival for the May 12 interview. Woods further acknowledged that he initialed each right and signed the Form when SA Eversman presented it to him. Woods testified that although he understood the rights as they were presented to him on the Form, he was not "fully aware of the connotations" of the situation in which he found himself. When pressed, however, Woods acknowledged that he knew he was suspected of child pornography, as that information was written on the top of the Form when it was presented to him. Woods also acknowledged that he would not have signed the Form, including the statement that no threats or promises had been made, if the information contained therein was incorrect.

At the conclusion of the May 12 interview, agents asked for, and received, permission to search Woods's residence.[9] Although the Permissive Authorization for Search and Seizure stated that the agents were "conducting an investigation concerning the transfer; receipt of child pornography," (Gov't Ex. 2), according to Woods, he interpreted SA Ozden's prior description of his work on a task force to mean that having SA Ozden search his computer was simply part of the process for removing contraband from circulation. In any event, there is no dispute that Woods knew at that time that the purpose of the search was to look for child pornography. Nevertheless, Woods testified that he "understood" that he was not going to be prosecuted. When pressed to clarify how he reached this understanding, Woods conceded that no promises were made to him. Rather, he repeatedly stated that despite all of the oral and written warnings provided to him about being a suspect in a child

---

[9]Woods later limited the scope of the search to his computer, and that limitation was honored.

14

pornography investigation, he was "led to believe" that he was not being investigated or "sought" for the purpose of prosecution.

Woods was allowed to leave the building where the initial interview took place to drive by himself to meet agents at a gas station on Fort Gordon, and after meeting at the gas station, he drove to his residence by himself, with the agents following separately. Upon arrival at the residence, Woods was allowed to enter his room, unaccompanied, prior to allowing SA Ozden to "preview" the computer. Once SA Ozden finished the "preview," Woods signed another consent form, this time "to permit a complete search" of his "homebuilt" computer. Gov't Ex. 3. Woods was not impaired or under the influence at the time he gave his consent.[10]

### 2. July 16, 2009 Interview

Woods had been working a "few" hours[11] on the morning of July 16 when he was directed by his superiors to attend a meeting in the Army CID building at Fort Gordon; as Woods did not have his own vehicle, he was taken to the interview in a car driven by SA Williams. SA Eversman was waiting in the interview room when Woods arrived. SA Eversman again reviewed the Form with the advisement of rights with Woods. Woods admitted that he never raised any questions with SA Eversman (or SA Ozden during the May

---

[10]Woods testified at the hearing that when he signed the consent form presented by SA Ozden he had not slept in approximately 20 hours. However, he also testified that he never alerted any of the agents to this lack of sleep or otherwise suggested that he was not in a proper frame of mind to be giving consent.

[11]Woods testified that his shift began at 6:30 that morning, and the Form used to advise him of his rights had been initialed and signed by Woods as of 9:26 that morning. Gov't Ex. 5.

12 interview) about any of the rights in the Form. When asked at the hearing whether he was confused by the Form even though he had not raised any questions at the time of the interviews, the only right he addressed was the one concerning appointment of a military attorney. Woods did not state that he was confused about his right to have an attorney present during questioning or to have an attorney appointed for him; rather he merely testified that he understood - as the form stated - that if he did not want a military attorney, he would have to hire a civilian attorney.

During the July 16 interview, Woods was not under the influence of any intoxicants or otherwise impaired such that his ability to understand what was happening would have been compromised. Although Woods testified that he did not recall having been offered anything to drink or eat (except for perhaps a banana) during the approximately 6-7 hours that he spent with the agents on July 16 at Fort Gordon and at his residence, he also stated that he never asked for anything to eat or drink; he was provided a bathroom break when he requested it. In any event, he testified that he never indicated to agents that he was hungry, needed to eat, and/or simply could not continue without being given food or drink.

Once Woods had finished composing his written statement with SA Eversman at Fort Gordon, he consented to have the agents return to his residence to search for an external hard drive that he thought may have been boxed up in his garage. As Woods did not have his own car, and as the end of his work shift was approaching, he had made arrangements for a roommate to pick him up. However, because Woods had consented to have the agents go to his residence to look for the external hard drive, he was going to get a ride home with the

agents. Thus, he went to the place where he was to meet his ride and informed his roommate that he would be riding back to the residence with the agents instead.

After the search at his residence, the agents made a phone call, presumably to Woods's command, and after that phone call, the agents told him to get some things together because he would be staying on post for few days. While staying on post, Woods was free to move about; the restriction placed on him by his command was that he live in the barracks. Woods's stay on post was extended until his arrest on the charges forming the basis for his case.

## II.    DISCUSSION

### A.    Advice of Rights

Woods argues that the Form used to advise him of his constitutional rights prior to making a statement to agents was deficient. In particular, Woods argues that he was misinformed as to whether he had the right to have a civilian, rather than a military, attorney appointed for him. The government, on the other hand, contends that the information provided in the form sufficiently informed Woods of his rights. As explained below, the government has the better argument.

### 1.    Fifth Amendment or Sixth Amendment Right to Counsel?

"No person . . . shall be compelled in any criminal case to be a witness against himself. . . ." U.S. Const. amend V. "To give force to the Constitution's protection against compelled self-incrimination, the Court established in Miranda [v. United States, 384 U.S. 436 (1966)], 'certain procedural safeguards that require police to advise criminal suspects of their rights under the Fifth and Fourteenth Amendments before commencing custodial

17

interrogation.' " Florida v. Powell, 130 S.Ct. 1195, 2010 WL 605603, at *7 (U.S. Feb. 23, 2010) (citing Duckworth v. Eagan, 492 U.S. 195, 201 (1989)). The Supreme Court has defined custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Miranda, 384 U.S. at 444. When analyzing whether Miranda warnings are required, the Court must decide whether "under the totality of the circumstances, a reasonable man in the suspect's position would feel a restraint on his freedom of movement fairly characterized as that degree associated with a formal arrest to such extent that he would not feel free to leave." United States v. Muegge, 225 F.3d 1267, 1270 (11th Cir. 2000) (per curiam) (citation omitted).

The well-known warnings that must be given to a person subject to custodial interrogation are:

> [1] that he has the right to remain silent, [2] that anything he says can be used against him in a court of law, [3] that he has the right to the presence of an attorney, and [4] that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

Powell, 2010 WL 605603 at *7 (citing Miranda, 384 U.S. at 479). Although the four warnings "are invariable . . . the Court has not dictated the words in which the essential information must be conveyed." Id. (citations omitted). In fact, the Supreme Court "has never indicated that the 'rigidity' of Miranda extends to the precise formulation of the warnings given a criminal defendant. . . . Quite the contrary, Miranda itself indicated that no talismanic incantation was required to satisfy its strictures." California v. Prysock, 453 U.S. 355, 359 (1981) (per curiam); see also Duckworth, 492 U.S. at 203 ("The inquiry is

simply whether the warnings reasonably 'conve[y] to [a suspect] his rights as required by Miranda." (quoting Prysock, 453 U.S. at 361). The consequences of the failure to honor the rights protected by the Miranda warnings are clear, "[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Miranda, 384 U.S. at 444.

While the Fifth Amendment provides protection against compelled self-incrimination, the Sixth Amendment states that '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. "[T]he right to counsel granted by the Sixth . . . Amendment[] means at least that a person is entitled to the help of a lawyer at or after the time that judicial proceedings have been initiated against him 'whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.' " Brewer v. Williams, 430 U.S. 387, 398 (1977) (emphasis added). As the Eleventh Circuit has explained, "The Sixth Amendment guarantees a defendant a right to counsel in all criminal prosecutions, as a means of protecting his right to a fair trial. The right to counsel attaches once adversary judicial proceedings have been initiated against the defendant." United States v. Hidalgo, 7 F.3d 1566, 1569 (11th Cir. 1993).

At the time of the interviews on May 12, 2009 and on July 16, 2009, no adversary judicial proceedings had been initiated against Woods. The undisputed testimony is that no charging decisions had been made, let alone had formal proceedings to initiate judicial proceedings been undertaken. Accordingly, Woods's Sixth Amendment right to counsel is

19

not at issue, and all of the arguments at the hearing concerning the abilities of a military attorney versus the abilities of a civilian attorney to represent Woods in federal court are irrelevant to the Court's determination as to whether Woods's Fifth Amendment rights were violated. Rather, the Court must focus on whether the Form "touched all of the bases required by Miranda" in informing Woods of his options for invoking his right to prevent compelled self-incrimination. Duckworth, 492 U.S. at 203. Thus, the Court turns its attention to the sufficiency of the Form which was provided to, and signed by, Woods prior to each interview on May 12, 2009 and July 16, 2009.

### 2. Sufficiency of Warnings Provided to Woods

It is well established that "Miranda 'warnings are required before any statement may be admitted into evidence at trial which was elicited from a person in custody through interrogation.' " United States v. Adams, 1 F.3d 1566, 1575 (11th Cir. 1993) (citation omitted). Here, the government and the defense dispute whether Woods was "in custody" during the May 12 and July 16 interviews. However, based on the record established at the hearing, the Court concludes that Woods's custodial status during the two interviews is irrelevant because, as described in detail below, the warnings provided to Woods satisfy the requirements of Miranda.

Although Woods does not contest that agents provided him with warnings, both orally and in writing, he does contest the validity of those warnings. In particular, he challenges the advisement that he was entitled to a civilian lawyer retained at no cost to the United States or a military lawyer appointed at no cost to him. According to Woods, "the government agents utilized constitutionally deficient Miranda wavier of rights forms which

20

essentially advised the Defendant that he did NOT have the right to appointed counsel."

(Doc. no. 45, p. 3). As Woods explains in his affidavit:

> I was confused by them [the agents] about my Constitutional rights, because I believed I had no choice but to submit to their searches and make the statements, (based on what the agents advised me), because, as the attached waiver of rights forms from both dates show, I was advised and essentially told by the agents that I had no right to an appointed civilian lawyer and, as I knew then, I could not afford to retain one to defend me in civilian court nor to be present with me during questioning. I have since learned that, unlike what these agents advised me, I actually DO have a Constitutional right to appointed counsel in this case.

(Doc. no. 66, Aff., p. 1). In other words, Woods argues that he is constitutionally entitled under the Fifth Amendment not just to the presence of a lawyer during questioning, but to the presence of a particular type of lawyer. His argument fails.

First, as discussed above, the sole question before this Court as to the adequacy of the warnings on the Form is whether Woods's Fifth Amendment rights were violated. To the extent Woods argues that an appointed military lawyer would not have been able to defend him in civilian court, he has put the cart before the horse. No Sixth Amendment right to counsel had attached at the time of either interview. Rather, under the Fifth Amendment, Woods had the right to have counsel present as an "adequate protective device necessary to make the process of police interrogation conform to the dictates of the privilege [to remain silent]. [Counsel's] presence would insure that statements made in the government-established atmosphere are not the product of compulsion." Miranda, 384 U.S. at 466. Thus, the question is not whether Woods was provided information about what kind of attorney he might be entitled to if and when judicial proceedings - either military or civilian - were initiated. Rather, the question is whether Woods was advised that he had the right to have

an appointed attorney present while speaking with agents during these developmental stages of the investigation.

Second, the defense did not provide, and the Court is not aware of, a single case that has invalidated the standard waiver of rights form that was used during Woods's two interviews. While the government has provided a list of cases in which a military waiver of rights form was used and statements were subsequently admitted in judicial proceedings (doc. no. 50, p. 14; doc. no. 78, p. 7), the Court does not rely exclusively on these cases to reach its decision. As pointed out by the defense, these cases are not binding precedent for this Court, and the cases do not provide explicit analysis of the argument about the right to a civilian versus military lawyer that Woods has raised.[12]

Instead, the Court relies on published case law that repeatedly emphasizes that at the stage of proceedings where, as here, a person has the right to counsel to protect his rights against compelled self-incrimination, the person has the right to "an" attorney. There is nothing in the case law to suggest that under Miranda, a person subject to custodial interrogation has a right to be informed about any particular "type" of attorney (*i.e.*, military

---

[12]For example, in the case cited by the government out of the Southern District of Georgia, there was no specific analysis as to the validity of any particular one of the rights enumerated on the Form. United States v. Gohn, No. CR 208-26, 2009 WL 112814 (S.D. Ga. Jan. 16, 2009). The opinion stated, "Prior to each interview, Gohn was read his rights and provided with a Military Suspect's Acknowledgement and Waiver of Rights form containing Gohn's Miranda rights. Gohn initialed each right and signed the form before each interview. Id. at *4. Later, the court again accepted without elaboration that the rights on the Form were sufficient: "The record establishes that Gohn signed a standard Military Suspect's Acknowledgement and Waiver of Rights form prior to the[ two] interviews. By signing each of these forms, Gohn expressly waived his right to remain silent and his right to counsel." Id. Thus, while the military version of an advisement of rights was generally accepted as an appropriate warning of Miranda rights, the opinion does not offer any particular analysis of the civilian versus military counsel argument that Woods raises.

versus civilian) to be present during questioning, let alone that the person must be allowed to pick the particular type of attorney. As first evidenced in the Miranda case, the Supreme Court repeatedly refers to the right to have "an" attorney or "a" lawyer present during questioning. See, e.g., Miranda, 384 U.S. at 444, 470, 471, 472, 473, 474, 475, 477, 479. This general reference to the right to "an" attorney and the refusal to require a specific formulation of the words used to convey the substance of the required warnings continues throughout subsequent case law interpreting Miranda. Duckworth, 492 U.S. at 204 ("Miranda does not require that attorneys be producible on call, but only that the suspect be informed, as here, that he has the right to an attorney before and during questioning, and that an attorney would be appointed for him if he could not afford one."); Prysock, 453 U.S. at 360-61 ("[N]othing in the warnings given respondent suggested any limitation on the right to the presence of appointed counsel different from the clearly conveyed rights to a lawyer in general, including the right 'to a lawyer before your are questioned, . . . while you are being questioned, and all during the questioning.' "). Most recently, in Powell, *supra*, the Supreme Court rejected a lower court's determination that a suspect in a robbery investigation had not been adequately warned of the right to have counsel present during police questioning with the same reference to the right to a lawyer / an attorney:

> [Officers] informed Powell that he had "the right to talk to a lawyer before answering any of [their] questions" and "the right to use any of [his] rights at any time [he] want[ed] during th[e] interview." The first statement communicated that Powell could consult with a lawyer before answering any particular question, and the second statement confirmed that he could exercise that right while the interrogation was underway. In combination, the two warnings reasonably conveyed Powell's right to have an attorney present, not only at the outset of interrogation, but at all times.

23

Powell, 2010 WL 605603, at *8.[13]

Here, the record reflects that prior to both the May 12 and July 16 interviews, Woods was adequately advised of his rights under Miranda to consult with a lawyer, appointed if necessary, prior to any questioning and to have a lawyer present with him during the interviews. Gov't Exs. 1, 5. That the appointed lawyer would have been a military lawyer rather than a civilian lawyer is of no consequence because Woods was offered "an" appointed lawyer to protect his Fifth Amendment rights. Woods initialed that he understood his rights and that he did not want an attorney - of any variety - present. By signing the two Forms, Woods expressly waived his right to remain silent and his right to counsel. In sum, the Court finds that the warnings provided to Woods, orally and in writing, prior to the May 12 and July 16, 2009 interviews satisfied Miranda.

### B.    Waiver of Rights

Having determined that Woods received an advisement of rights that satisfied Miranda, the Court now turns its attention to whether Woods voluntarily made statements to agents and provided consent to search. The government bears the burden of establishing voluntariness. United States v. Mendenhall, 446 U.S. 544, 557 (1980); United States v.

---

[13]See also United States v. Contreras, 667 F.2d 976, 979 (11th Cir. 1982) ("A Miranda warning is adequate if it fully informs the accused of his right to consult with an attorney prior to questioning and does not condition the right to appointed counsel on some future event. . . . A Miranda warning need not explicitly convey to the accused his right to appointed counsel "here and now" . . . . (footnote omitted)); United States v. Brown, 569 F.2d 236, 239 (5th Cir. 1978) (per curiam) ("[W]e do not mandate that Miranda warnings include a specific question naming counsel and [] asking if he or she want that particular attorney present. Under the facts of this case the Miranda warnings were sufficient, when dealing with a well-educated teacher, to make clear than "an attorney" includes the state public defender already appointed.") .

Chirinos, 112 F.3d 1089, 1102 (11th Cir. 1997). Two distinct inquiries must be made. "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." Moran v. Burbine, 475 U.S. 412, 421 (1986). "Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Id. Stated otherwise, the Court must consider whether Woods made an "essentially free and unconstrained choice" or if "his will ha[d] been overborne and his capacity for self-determination critically impaired." Schneckloth v. Bustamonte, 412 U.S. 218, 225 (1973); see also United States v. Purcell, 236 F.3d 1274, 1281 (11th Cir. 2001) (citing Schneckloth).

In analyzing voluntariness, the Court must look at the totality of the circumstances. Oregon v. Elstad, 470 U.S. 298, 318 (1985); United States v. Watson, 423 U.S. 411, 424 (1976). Moreover, voluntariness is judged by looking at a variety of factors, none of which alone are dispositive. United States v. Bernal-Benitez, 594 F.3d 1303, 1319 (11th Cir. 2010); Purcell, 236 F.3d at 1281; Waldrop v. Jones, 77 F.3d 1308, 1316 (11th Cir. 1996). These factors include: the presence of coercive police procedures (e.g., the length of detention, the repeated and prolonged nature of the questioning, the use of physical punishment such as the deprivation of food or sleep), the extent of a person's cooperation with law enforcement agents, awareness of the right to refuse consent, a person's lack of education or low intelligence, and the lack of any advice to the accused of his constitutional rights. Purcell, 236 F.3d at 1281; Waldrop, 77 F.3d at 1316. This Court is also mindful that "[a] written waiver 'is usually strong proof of the validity of that waiver, but is not inevitably either

necessary or sufficient to establish waiver.' " United States v. Beckles, 565 F.3d 832, 840 (11th Cir. 2009) (citation omitted).

### 1.    Voluntary Relinquishment of Rights

Prior to the hearing, Woods had alleged that his statement to agents and consent to search were not voluntary because "government agents improperly made certain promises to him, and engaged in a ruse and other inappropriate conduct toward him which obviates or eradicates the voluntariness of any of his statements, and consent to search."[14] (Doc. no. 45, p. 4). Woods states in his affidavit, "Before my computer was obtained from me by the Navy and F.B.I. agents, (Eversman and Ozden), in May, 2009, and before I made the statements at issue in both May and July, 2009 about this case, I was misled by the agents who essentially indicated to me that I would not be charged if I cooperated." (Doc. no. 66, Aff., p. 1). The government acknowledges that misrepresentations can invalidate consent if consent was given in reliance upon those misrepresentations but maintains that so long as the person giving consent is aware of the subject matter of the investigation and the possibility that he may become a suspect in the future, the Court can find that consent was given voluntarily. (Doc. no. 78, p. 6). Based on the evidence developed at the hearing, the Court concludes that the government has shown that Woods voluntarily, knowingly, and

_____

[14]There is no dispute that agents used a ruse about a web site closing down to initially get Woods to speak with them. As explained at the hearing, agents used the ruse about a web site because Ms. Woods had indicated that she was fearful of what might happen if Woods knew that she had provided the information to initiate the investigation. However, as described in detail herein, at all times, Woods was aware that he was a suspect in a child pornography investigation, and thus, there is no problem with the manner in which agents first started their interview with Woods. (See also doc. no. 78, p. 6 (citing cases relying on importance of notice of subject matter of investigation in voluntariness analysis).

intelligently waived his <u>Miranda</u> rights, made statements to the agents, and consented to allow agents to search his computer[15] and, on July 19, his residence.[16]

In <u>Jackson v. Denno</u>, 378 U.S. 368 (1964), the Supreme Court explained that a defendant is deprived of Due Process if he is convicted, based in any part, on an involuntary confession. 378 U.S. at 376. Coercion may be mental or physical, <u>Blackburn v. Alabama</u>, 361 U.S. 199, 206 (1960), and "sufficiently coercive conduct normally involves subjecting

---

[15]Woods's initial suggestion (doc. no. 45, p. 5) that there was a problem with agents searching a government computer that he used at work is a non-issue insofar as the motion to suppress is concerned. Woods testified that it was a network computer which he never removed from the premises. Moreover, Woods acknowledged that he was aware of a sticker posted on the computer terminal, as well as an electronic banner on the screen, stating that the machine was for official use only and subject to monitoring, and therefore he knew that anything on that computer was subject to monitoring. As it is well-established that only persons with a legitimate expectation of privacy in the area searched may invoke the protections of the Fourth Amendment, <u>Smith v. Maryland</u>, 442 U.S. 735, 740 (1979), and as Woods admitted at the hearing that he was aware of the warning banner on the computer terminal and screen that anything on the computer was subject to monitoring, he had no legitimate expectation of privacy in that government computer. Thus, he cannot challenge the search of the government computer.

Likewise, there is no basis for Woods to challenge the search of the computer that he had given his to his ex-wife which was the catalyst for the investigation in this case. The evidence establishes that the computer had been given to Ms. Woods for her use and was in fact in her possession in Arizona (while Woods was working at Fort Gordon in Georgia) at the time that she gave it to agents for examination. Thus, Woods had no reasonable expectation of privacy in that computer. <u>Smith</u>, 442 U.S. at 743-44 ("The Court consistently has held that a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties."). The Court will therefore focus its analysis on Woods's personal computer that was seized on May 12, 2009.

[16]Although the Court concludes that Woods voluntarily consented to the search of his residence on July 19, 2009, as the external hard drive that agents had been searching for was not found, and as there was no indication at the hearing that any other evidence was obtained during that search, the Court is unaware of anything that might be subject to suppression from that July 19 search.

the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession." United States v. Thompson, 422 F.3d 1285, 1295-96 (11th Cir. 2005). Although Woods initially claimed he had been misled by agents who "essentially indicated" that if he cooperated he would not be charged, he conceded at the hearing that no threats or promises had been made to him to get him to sign the Form that stated he waived his rights. Furthermore, SA Eversman and SA Ozden credibly testified that no promises had been made to Woods that he would not be prosecuted if he cooperated.[17] The Court also notes that the record shows a consistent history of Woods's cooperative demeanor throughout his encounters with the agents.[18]

To the extent that Woods testified that he was "led to believe" that he would not be prosecuted if he cooperated with agents, courts have repeatedly held that statements about making cooperation known to the court or prosecutors do not qualify as prohibited coercion.

---

[17]"Credibility determinations are typically the province of the fact finder because the fact finder personally observes the testimony and is thus in a better position than a reviewing court to assess the credibility of witnesses." United States v. Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002); see also United States v. Pineiro, 389 F.3d 1359, 1366 (11th Cir. 2004) (recognizing that credibility determinations are within the province of the factfinder). In making its credibility determination, the Court must take into consideration not only the interests of the witness, but also "the internal consistency of the [witness's] testimony, or his candor or demeanor on the stand." Ramirez-Chilel, 289 F.3d at 749, 750 (citations omitted). The Court credits the testimony of both SA Eversman and SA Ozden, who consistently and confidently testified that no threats or promises about prosecution had been made to Woods. Although Woods initially suggested in his affidavit that he had been misled about the consequences of cooperation, under the rigors of providing live testimony subject to cross-examination, he changed his position and conceded that no promises or threats had been made. Thus, the Court does not credit Woods's pre-hearing contentions that improper promises were made to him to obtain his cooperation.

[18]Indeed, this cooperativeness was first memorialized in this Court's August 20, 2009 detention order. (Doc. no. 15, pp. 3-4).

United States v. Davidson, 768 F.2d 1266, 1271 (11th Cir. 1985) ("A statement made by a law enforcement agent to an accused that the accused's cooperation would be passed on to judicial authorities and would probably be helpful to him is not a sufficient inducement so as to render a subsequent incriminating statement involuntary.'); United States v. Klein, 592 F.2d 909, 913 (5th Cir. 1979)[19] (finding no illegal promise of reward where credible testimony showed that agent informed suspect that if he cooperated with agents, "they would so inform the Court and prosecuting officials but that the information would not necessarily affect the suspect's case"); United States v. Ballard, 586 F.2d 1060, 1063 (5th Cir. 1978) ("Encouraging a suspect to tell the truth . . . does not, as a matter of law, overcome a confessor's will. . . .  Neither is a statement that the accused's cooperation will be made known to the court a sufficient inducement so as to render a subsequent incriminating statement involuntary.").

Here, SA Eversman testified that no threats or promises were made to Woods, and SA Ozden testified that although he may have told Woods at the May 12 interview, in conformance with his typical interview routine, that the United States Attorney's Office would be made aware of any cooperation, he did not tell Woods that Woods would not be charged.  Importantly, Woods himself conceded at the hearing that no promises had been made to him that he would not be prosecuted; the best he could say was that he "understood"

---

[19]In Bonner v. City of Prichard, the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions that were handed down prior to the close of business on September 30, 1981.  661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

from what the agents told him that he would not be prosecuted. However, this "understanding" simply does not comport with the credible evidence that no improper promises were made to induce Woods to make a statement or provide consent to search.

To the extent Woods raised for the first time at the hearing that he did not feel free to leave the interviews and thus perhaps tried to suggest that this intimidated or coerced him into providing statements and/or consent to search, the credible evidence does not support such a conclusion.[20] The record shows that the interviews and interactions with agents occurred at the familiar locations of Woods's place of employment and at his residence,[21] and no threats or promises were made. Woods was informed of his rights within minutes of the start of each interview, and as to the first interview, Woods was also allowed to make his own travel arrangements to return to his residence. Once there, he was allowed to enter his room unaccompanied before SA Ozden conducted his "preview" of the computer. On July 16, Woods met the roommate that was to give him a ride home and told him that he would be riding home with the agents. Although at the end of Woods's July 16 interview he was taken to stay in the barracks at Fort Gordon, that was done at the direction of his command, to whom Woods was responsible by virtue of his position in the military.

Moreover, at the time of the interviews, Woods was a 23 year-old Arab linguist who had completed not only high school, but 18 months of language training. His rights were

---

[20]In any event, the Supreme Court has ruled that under certain circumstances, even if a person does not feel free to leave, consent may still be voluntary. Florida v. Bostick, 501 U.S. 429, 435-36 (1991). As discussed in detail herein, the circumstances of Woods's encounters with the agents establishes voluntariness.

[21]When agents arrived at Woods's residence on May 12, they were told that Woods's roommates were present.

explained to him orally and in writing, and Woods testified at the hearing that he understood those rights as they were explained to him. Additionally, neither interview could be considered "exhaustingly long." In each instance, Woods initialed each right and signed the Form within the first few minutes of being in the room with agents. The May 12 interview lasted only approximately 30 minutes before Woods agreed to follow agents to his residence in a vehicle that he drove by himself.[22] Although the July 16 interview lasted approximately two hours, with an additional two and one half hours for SA Eversman and Woods to compose Woods's statement, under an examination of the totality of the circumstances this time frame does not make Woods's waiver of rights or consent to search involuntary.

Woods also attempts to make much of the fact that he did not have any food or drink during the July 16 encounter. However, the record establishes that Woods was offered but declined a banana, and in any event, Woods did not make any request for food or drink, let alone a request that was denied. As to the fact that Woods's command directed him to return to the barracks after the July 16 interview, that does not render Woods's statement involuntary; he had not been informed that he would be confined to the barracks prior to talking to agents and writing out his statement, and in any event, the directions came from his command, not the agents conducting the investigation.

Thus, the Court turns to the final inquiry.

---

[22]Although Woods testified at the hearing that he had been awake for approximately 20 hours by the time the May 12 encounter concluded, the interview started and the advice of rights was provided during Woods's regular work shift, and in any event, there is no evidence that he expressed that he needed to rest before continuing with the interview and/or deciding to provide consent to search his computer. To the contrary, the testimony at the hearing was that Woods always seemed to be aware of his surroundings and otherwise alert to the events taking place.

## 2.    Awareness of Rights and Consequences of Relinquishment

The record also establishes that Woods waived his <u>Miranda</u> rights and provided consent to search with the requisite level of comprehension. Woods was 23 years old at the time of the events in question and, as noted above, was working as an Arab linguist; there is no evidence of low intelligence. At the top of the Form used on May 12, Woods was clearly advised that he was suspected of "receipt and/or transfer of child pornography," Gov't Ex. 1, and on the Permissive Authorization for Search and Seizure Form signed on May 12 prior to SA Ozden's "preview" of the computer, Woods was clearly advised that NCIS was "conducting an investigation concerning the transfer; receipt of child pornography." Gov't Ex. 2. SA Ozden then obtained an additional "Consent to Search" prior to the computer being seized "to permit a complete search." Gov't Ex. 3. On the Form used July 16, Woods was clearly advised that he was suspected of "receipt and/or transfer of child pornography; child sexual abuse." Gov't Ex. 5. Woods chose to ignore these explicit warnings at his own peril. Indeed, Woods does not deny that he had been given the information reflected on the Forms and on the consents to search; rather his testimony boils down to the fact that he did not take seriously enough the gravity of the situation in which he found himself. However, "a defendant's ignorance of the full consequences of his decisions" does not vitiate voluntariness. <u>Elstad</u>, 470 U.S. at 316. Stated otherwise, that a defendant "was unaware of the potential consequences of statements made to the police" does not make a waiver of rights involuntary. <u>Id.</u> at 317.

In sum, under the totality of the circumstances as set forth by the documentary evidence and credible testimony at the hearing, the Court concludes that Woods's statements

and consent to search were the product of a free and deliberate choice. The record does not indicate that Woods waived his rights as a result of intimidation, coercion, or deception. The record also shows that Woods waived his rights with the requisite level of comprehension. Thus, none of the statements or evidence obtained from Woods or from the search of his computer are subject to suppression.

## III.   CONCLUSION

For the reasons set forth above, the Court **REPORTS** and **RECOMMENDS** that the motion to suppress be **DENIED**.  (Doc. nos. 45, 66).

SO REPORTED and RECOMMENDED this $24$th day of March, 2010, at Augusta, Georgia.

W. LEON BARFIELD
UNITED STATES MAGISTRATE JUDGE